**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY,**
**CENTRAL DIVISION AT LEXINGTON**

| | | |
|---|---|---|
| **EUDENE HOOD,** | ) | **No.** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| **v.** | ) | |
| | ) | |
| **JOHNSON & JOHNSON and** | ) | |
| **ETHICON, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

COMES NOW Plaintiff, Eudene Hood ("Plaintiff"), by and through her attorneys of record, and, for her cause of action against Johnson & Johnson and Ethicon, Inc. (collectively "Defendants"), states and alleges as follows:

## PARTIES

1.     Plaintiff is a citizen of the United States of America and a resident of the State of Kentucky.

2.     Defendant Johnson & Johnson ("Johnson & Johnson") is a New Jersey Corporation headquartered in New Brunswick, New Jersey.

3.     Defendant Ethicon, Inc. is a New Jersey corporation headquartered in Summerville, New Jersey.  Ethicon, Inc. is a subsidiary of Johnson & Johnson.

4.     All acts and omissions of Defendants, as described herein, were done by their agents, servants, employees, and/or owners acting in the course and scope of their respective agencies, services, employments, and/or ownership.

## JURISDICTION AND VENUE

5.       Jurisdiction is proper in this Court, pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds seventy-five thousand dollars ($75,000), exclusive of interest and costs, and complete diversity of citizenship exists between Plaintiff and Defendants.

6.       Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because Plaintiff was implanted with and subsequently injured by Defendants' TVT Obturator ("TVT-O") and Prolene Mesh ("Prolene") products (both "Products") in London, Laurel County, Kentucky.

## COMMON FACTS

### A.       Stress Urinary Incontinence and Pelvic Organ Prolapse

7.       At all relevant times, Defendants were in the business of designing, manufacturing, promoting and selling their polypropylene pelvic mesh products, including the Products at issue herein, as devices intended to treat stress urinary incontinence and /or pelvic organ prolapse.

8.       Stress urinary incontinence ("SUI") is the involuntary loss of urine during movement that puts pressure on the bladder, such as laughing, coughing, sneezing, or aerobic or strenuous exercise.  Although incontinence is suffered by both men and women, it is more common in women and can be caused by menopause or by physical changes that occur in the body during pregnancy or childbirth.

9.       Childbirth, for example, can injure the pelvic floor muscles and ligaments that help support a woman's bladder. If these structures weaken, the bladder can move downward, pushing slightly out of the bottom of the pelvis toward the vagina. The movement of the bladder, or other pelvic organs, such as the urethra, cervix or rectum, is known as pelvic organ prolapse ("POP"). A prolapsed bladder can prevent the muscles that ordinarily force the urethra shut from squeezing as tightly as they should, resulting in an involuntary loss of urine.

10. Both SUI and POP are, in many cases, treatable. A woman who elects to have SUI or POP surgically treated has several options. SUI, for example, can be corrected through abdominal surgery using sutures to attach the urethra to a ligament in the pelvis (known as the "Burch procedure"). SUI also can be surgically addressed using synthetic materials such as suprapubic mid-urethral "slings" placed under the urethra to provide support. Similarly, POP can be corrected through traditional procedures via abdominal or transvaginal surgery. POP also can be surgically addressed using biologic, composite, or synthetic materials.

11. Surgical mesh products have been used to repair abdominal hernias since the 1950s.

12. In the 1990s, manufacturers (such as Defendants) began to modify the mesh used in hernia repair to be used as "pelvic mesh products" specifically intended to correct SUI and POP. Defendants' pelvic mesh products were derived from Defendants' polypropylene hernia mesh products, and were and are utilized in the treatment of medical conditions in the female pelvic area, primarily pelvic organ prolapse and stress urinary incontinence.

13. In the late 1990s, Defendants determined a safer mesh was available for use and subsequently changed the mesh used in their hernia applications. Defendants did not make a similar revision to the mesh used in the Products implanted in Plaintiff.

14. Defendants manufacture, label, package, distribute, market, supply, and sell pelvic mesh products, as well as pelvic mesh "kits," which can include the surgical mesh and also tissue fixation anchors and insertion tools.

15. At the time of implant in to Plaintiff, the pelvic mesh products manufactured by Defendants were considered Class II medical devices.

16. Unlike Class III medical devices, such as an artificial heart or an Automated External Defibrillator, Class II devices do not require "approval" by the Food and Drug

Administration ("FDA"). Whereas Class III devices cannot be sold until the manufacturer demonstrates to the FDA, through adequate and well-controlled clinical trials, that the proposed device is safe and effective, there is no such requirement for Class II devices.

17.     Under the FDA's "Substantial Equivalence" process under Section 510(k) of the Food, Drug and Cosmetic Act, a manufacturer must provide a premarket notification that allows the FDA to determine whether a medical device is substantially equivalent to a "predicate device." A predicate device is one that the FDA has placed into one of three categories and "cleared" for marketing.

18.     The "premarket notification" process -- for Class II devices -- is not focused on whether the device is safe and effective, but rather is concerned with whether the proposed device is substantially equivalent to an existing predicate device that was already cleared for marketing by the FDA.

19.     At all times material to this action, Defendants designed, tested, patented, manufactured, packaged, labeled, marketed, sold, and distributed a line of pelvic mesh products intended to treat POP and SUI, including Products implanted into Plaintiff. Each of these products was cleared for sale in the United States after the Defendants made assertions to the FDA of "Substantial Equivalence" under Section 510(k). This clearance process does not require the applicant to prove safety or efficacy.

20.     One of the pelvic mesh products that Defendants designed, tested, patented, manufactured, packaged, labeled, promoted, marketed, sold, and distributed was the TVT-O, which was intended to treat SUI.

21.     The Gynecare TVT-O is a polypropylene mesh product made and marketed by Defendants to treat stress urinary incontinence ("SUI"). The product consists of PROLENE®

polypropylene mesh with a with a polyethylene sheath or covering and attached trocars / surgical device, a TVT introducer, a TVT Rigid Catheter Guide and Instructions for Use ("IFU").

22.     From the time it was introduced to the market through January 2015, the IFU for the TVT-O did not change.

23.     Defendants were aware, or should have been aware, of the dangers inherent in the TVT-O, notwithstanding the fact that the TVT-O was "cleared" for sale by the FDA.

24.     Another of the pelvic mesh products that Defendants designed, tested, patented, manufactured, packaged, labeled, promoted, marketed, sold, and distributed was the Prolene Mesh, which was intended to treat POP or SUI.  Like the TVT-O, Defendants; Prolene Mesh is made from polypropylene.

25.     Defendants were aware, or should have been aware, of the dangers inherent in the Prolene Mesh, notwithstanding the fact that the Prolene Mesh was "cleared" for sale by the FDA.

26.     Defendants' pelvic mesh products, including the Products specifically used for Plaintiff, have been and continue to be marketed to the medical community and to patients as safe, effective, reliable medical devices implanted by safe and effective, minimally invasive surgical techniques for the treatment of medical conditions, primarily pelvic organ prolapse and stress urinary incontinence. Defendants market the pelvic mesh products, including the Products specifically used for Plaintiff, as safer and more effective when compared to 1) the traditional products and procedures for treatment of pelvic organ prolapse and stress urinary incontinence and 2) other competing pelvic mesh and sling products.

27.     Defendants made public statements in the form of written product descriptions, product labels, promotional materials, marketing materials and other materials that asserted that implanting the Products was safe and would not cause harm to patients, like Plaintiff. Defendants

have also marketed and sold the Products to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to direct to consumer advertising, aggressive marketing to health care providers at medical conferences, hospitals, private offices and include the provision of valuable consideration and benefits to health care providers. Also utilized are documents, brochures, websites, telephone information lines, and training offering exaggerated and misleading expectations as to the safety and utility of Defendants' Products.

28.     Contrary to Defendants' representations and marketing to the medical community and to the patients themselves, Defendants' Products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to the Plaintiff. These defects include, but are not limited to:

a.   The mesh material used in the Products is not inert and therefore reacts (i.e. foreign body response) to human tissues and/or other naturally occurring human bodily contents adversely affecting patient health;

b.   The mesh material used in the Products is not pure as it contains additional compounds which are leached from the mesh and are toxic to tissue which enhances the body's inflammatory reaction (foreign body response);

c.   The mesh material used in the Products harbors infections as a result of the weave of the mesh that adversely affect human tissues and patient heath;

d.   The Products migrate from the location of their implantation, adversely affecting tissues and patient health;

e.   The Products regularly fail to perform the purpose of their implantation such that the patient requires removal of the device and repeated treatment and surgery;

f.   Due to their various defects, the Products regularly cause significant and permanent injury to patients such that the Products must be removed, resulting in additional surgery;

g. The Products become embedded in human tissue over time such that if it needs to be removed due to its various defects, the removal causes damage to the organs and tissues, adversely affecting patient health;

h. The Products are defective in shape, composition, weight, physical, chemical and mechanical properties and is inappropriately engineered for use in the female pelvis; and

i. The Products erode into other pelvic organs, tissue, muscle, nerves, and bone adversely affecting tissues and patient health.

29.     Because of their numerous defects, the Products create an unreasonable risk of injury and other adverse health consequences for patients, including, but not necessarily limited to, mesh erosion, extrusion/protrusion, chronic pain, mesh contraction, foreign body response, infection, abscesses, fistula, inflammation, scar tissue, organ perforation, dyspareunia, bleeding, neuropathic, and other acute and chronic nerve damage and pain, pudendal nerve damage, vaginal scarring, vaginal shrinkage, pelvic floor damage, pelvic pain, urinary and fecal problems, prolapse of organs, and in many cases forcing the need for intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia, and injuries to the woman's intimate partner.

30.     Defendants have consistently underreported and withheld information about the propensity of the Products to fail and cause injury and complications, and have misrepresented the efficacy and safety of the Products, through various means and media, actively and intentionally misleading the FDA, the medical community, patients and the public at large.

31.     Defendants have known and continue to know that its Products were and are causing numerous patients, including Plaintiff, severe injuries and complications. Defendants suppressed this information, and failed to accurately and completely disseminate or share this and

other critical information with the FDA, health care providers, or the patients. As a result, Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers and patients, into believing that the Products were and are safe, effective, and would not cause harm to patients. These statements were made with the intent that medical professionals and members of the public would rely upon them, with the intent that members of the public would pay for the Products and that the Products would be implanted in patients. When Defendants made these statements, they knew or should have known that the statements were inaccurate.

32.     Defendants have at all times provided incomplete, insufficient, and misleading training and information to physicians, in order to increase the number of physicians utilizing the Products, and thus increase the sales of the Products, and also leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

33.     On October 21, 2008, the FDA issued a Public Health Notification that described over 1,000 complaints that had been reported over a three-year period related to pelvic mesh products.

34.     Defendants were aware of numerous defects in the Products as a result of several published, peer reviewed, scientific studies, including, but not limited to, the defects and unreasonable risks identified above. Defendants also knew or should have known that the Products caused an unreasonably high rate of complications, such as mesh erosion, extrusion/protrusion, chronic pain, mesh contraction, infection, foreign body response, abscesses, fistula, inflammation, scar tissue, organ perforation, dyspareunia, bleeding, neuropathic, and other acute and chronic nerve damage and pain, pudendal nerve damage, vaginal scarring, vaginal shrinkage, pelvic floor damage, pelvic pain, urinary and fecal problems, and prolapse of organs in women implanted with

the Products. Despite being aware of the numerous defects and unreasonable risks in its Products, Defendants developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold and otherwise engaged in all activities that are part and parcel of the sale and distribution of the Products with the intent that it would be implanted in patients, like Plaintiff. Defendants were aware that implanting the Products in patients was likely to cause injury and harm to the patients into whom the Products were implanted, including Plaintiff. Alternatively, Defendants failed to exercise reasonable care in determining the risks and potential adverse consequences of implanting the Products into patients, like Plaintiff.

35.     Despite Defendants' knowledge of the catastrophic injuries, conditions, and complications caused by their pelvic mesh products, Defendants have, and continue to manufacture, market and sell the pelvic mesh products, while continuing to fail to adequately warn, label, instruct, and disseminate accurate information with regard to their pelvic mesh products, both prior to and after the marketing and sale of the Products.

36.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine the safety and effectiveness of the Products.

37.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Products.

38.     Defendants failed to design and establish a safe, effective procedure for removal of the Products; therefore, in the event of a failure, injury, or complication it is impossible to easily and safely remove the Products.

39.     Feasible and suitable alternative designs as well as suitable alternative procedures and instruments for implantation and treatment of stress urinary incontinence, pelvic organ

prolapse, and similar other conditions have existed at all times relevant as compared to the Defendants' Products.

40.     Defendants have failed to provide adequate warning or information about the risks that the Products cause an unreasonably high rate of complications, including mesh erosion, extrusion/protrusion, chronic pain, mesh contraction, infection, foreign body response, abscesses, fistula, inflammation, scar tissue, organ perforation, dyspareunia, bleeding, neuropathic, and other acute and chronic nerve damage and pain, pudendal nerve damage, vaginal scarring, vaginal shrinkage, pelvic floor damage, pelvic pain, urinary and fecal problems, and prolapse of organs to physicians who implanted the Products, or to women implanted with the Products, like Plaintiff.

41.     Due to defects in design, manufacture and warnings, the TVT-O and Prolene Mesh implanted into the Plaintiff were unreasonably dangerous at the time that they left Defendants' control.

**B.    Plaintiff's Medical History and Experience**

42.     On December 22, 2005, Plaintiff's doctor implanted TVT-O mesh to treat Plaintiff's SUI.  This procedure took place at Marymount Medical Center in London, Kentucky. The Product used (i.e., a polypropylene TVT-O mesh kit) was designed, manufactured, packaged, labeled, marketed, and sold by Defendants.

43.     Ms. Hood's doctor implanted this Product in Plaintiff with the intention of treating her SUI, a use for which Defendants marketed and sold this Product.

44.     Plaintiff's surgery was performed without intraoperative complications.

45.     At all times, the TVT-O that was implanted in Plaintiff was being used for the purpose that Defendants marketed and sold the product.

46. The TVT-O implanted into the Plaintiff was in the same or substantially similar condition as they were when they left the possession of Ethicon, and in the condition directed by Defendants.

47. Defendants' TVT-O was at all times utilized and implanted in a manner foreseeable to Defendants.

48. Despite Defendants' representations regarding its Products, Plaintiff's implanted TVT-O did not resolve her stress urinary incontinence.  In addition, Plaintiff began to experience pain with intercourse, recurring vaginal pain, and blood in her urine after implant of the TVT-O.

49. On July 7, 2011, Plaintiff's doctor implanted Prolene Mesh in an effort to treat Plaintiff.  Dr. Jennifer Fuson performed this surgery at Central Baptist Hospital in Lexington, Kentucky and the Prolene Mesh was designed, manufactured, packaged, labeled, and sold by Defendants.

50. Plaintiff's surgery was performed without intraoperative complications.

51. At all times, the Prolene Mesh that was implanted in Plaintiff was being used for the purpose that Defendants marketed and sold the product.

52. The Prolene Mesh implanted into the Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants, and in the condition directed by Defendants.

53. Defendants' Prolene Mesh was at all times utilized and implanted in a manner foreseeable to Defendants.

54. As a result of the defective mesh Products implanted in Plaintiff, Plaintiff subsequently suffered serious bodily injuries, including extreme pain, mesh erosion, and other injuries similar to the ones described in the FDA's Public Health Advisory of October 21, 2008.

55.     As a direct and proximate result of Defendants' conduct and omissions, Plaintiff has suffered, and continues to suffer, multiple severe and painful personal injuries, including, but not limited to, pain, mesh erosion and exposed mesh; has undergone and likely will undergo additional corrective surgery or surgeries, including but not limited to removal of the Defendants' Products on November 8, 2017 at St. Joseph Hospital in Lexington, Kentucky.  Plaintiff has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses and likely will continue to incur such expenses in the future.

56.     Plaintiff's injuries would not have occurred but for the defective nature of the Products implanted and/or Defendants' wrongful conduct.

57.     The acts, conduct, and omissions of Defendants, and each of them, as alleged throughout this Complaint were fraudulent, willful and malicious and were done with a conscious disregard for the rights of Plaintiff and other users of the Products and for the primary purpose of increasing Defendants' profits from the sale and distribution of the Products.

58.     Plaintiff, in the exercise of due diligence, could not reasonably have discovered the cause of her injuries, including, but not limited to, the defective design of the Products implanted inside of her, until such time that her doctors advised her that there was a problem with the mesh, which occurred no earlier than 2014 and shortly before Plaintiff commenced her legal action against Defendants.

59.     Plaintiff commenced her legal action against Defendants on November 25, 2014 via short-form, direct filing protocol in MDL No. 2327.  Plaintiff's claim was part of the consolidated Multidistrict Litigation in the Southern District of West Virginia, MDL No. 2327. Plaintiff's case was subsequently part of a "Wave Order" in which limited case specific discovery

occurred prior to voluntary dismissal without prejudice and implementation of a private tolling agreement, which expires on December 31, 2020.

## COUNT I: NEGLIGENCE

60.     At all times material hereto, Defendants had a duty to Plaintiff and to other foreseeable users of the Products, to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling, assembling, packaging, distribution, detailing, promotion and sale of the Products.

61.     Defendants had a further duty to provide adequate and sufficient instructions concerning the proper use of the Products, as well as warnings of the risks and dangers associated with using the Products, to Plaintiff and to other foreseeable users of the Products.

62.     Defendants had a duty to exercise reasonable care in the advertising and sale of the Products, including a duty to warn and instruct Plaintiff and her of the dangers associated with the use of the Products that were known or should have been known to the Defendants at the time of the sale of the Products to Plaintiff.

63.     Defendants provided information to physicians at medical association conferences and hosted events to provide information regarding the polypropylene devices, including the Products at issue.  Further, Defendants took steps to "instruct" or train physicians on implantation techniques through the Instructions for Use and in person trainings.  Defendants also sought out doctors to increase sales and the number of procedures performed.

64.     Defendants had a duty to exercise reasonable and ordinary care in the recruitment and training of physicians to implant the Product.

65.     Defendants breached their duties to Plaintiff when they failed to exercise reasonable care in the design, manufacture, testing, inspection, processing, advertising, marketing, labeling,

assembling, packaging, distribution, detailing, promotion, training, and sale of their Products so as to avoid unreasonable risk of harm to women in whom the Products were implanted, including Plaintiff.

66.     Defendants failed to perform or rely on proper and adequate testing and research in order to determine and evaluate the risks and benefits of the Products.

67.     The Products implanted in Plaintiff was unreasonably dangerous and defective for reasons that include, but are not limited to, the following:

a)   The use of polypropylene material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b)   The design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh during the insertion process causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

c)   Biomechanical issues with the design of the Products, including, but not limited to, the propensity of the Products to contract or shrink (up to 50%) inside the body that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

d)   The propensity of the Products to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

e)   The inelasticity of the Products, causing it to be improperly mated to the delicate and sensitive areas of the pelvis where it is implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

f)   The propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory and fibrotic reaction and results in continuing injury over time;

g)   The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the Products are implanted according to the manufacturer's instructions;

h)   The Products degrade over time, causes chronic foreign body reactions, fibrotic bridging, mesh contracture / shrinkage, fraying, deformation, roping, rolling and curling of the mesh;

i) Adequate studies to establish safety and effectiveness for permanent human implantation of the Products to treat SUI are lacking;

j) The Directions For Use that Defendants provided with all mesh products do not fully disclose or adequately warn about the Products' known or knowable risks, adverse reactions, and characteristics;

k) The use of polypropylene material in the Products and the failure to provide adequate Directions for Use and training;

l) Defendants failed to design and establish a safe, effective procedure for removal of their Products; therefore, in the event of a failure, injury, or complication, it is impossible to easily and safely remove the Products;

m) Defendants used non-medical grade material to make their Products; and

n) The pore size and stiffness of the Products were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

68.     Defendants also breached their duty to adequately and sufficiently warn Plaintiff and her healthcare providers and other foreseeable users of the Products' propensity to erode, the rate and manner of mesh erosion, the risk of chronic infections resulting from implantation of the Products, the differences of severity of foreign body response between synthetic and biologic mesh, the risk of vaginal scarring as a result of implantation of the Products, the risk of recurrent severe pelvic pain and chronic pain resulting from the implantation of the Products, the need for corrective or revisionary surgery to adjust or repair the Products, or the overall severity of complications that could arise as a result of implantation of the Products.

69.     Defendants' Products incorporate a monofilament polypropylene mesh unintended for the treatment of POP and/or SUI. Despite claims that this material is inert, the emerging scientific evidence suggests that this material is biologically incompatible with human tissue and promotes an immune response in a large subset of the population receiving Defendants' products containing this material, including the Products implanted into Plaintiff. This immune response promotes degradation of the pelvic tissue and can contribute to the formation of severe adverse

reactions to the mesh. Moreover, the mesh migrates within the surrounding tissues causing irreparable damage to the tissue including nerve endings residing within the tissues. Damaged nerve endings do not regenerate and lead to debilitating neuromas suffered by patients such as Plaintiff.

70.     Defendants made claims and representations in documents submitted to the FDA, in reports to the public and to healthcare professionals, and in advertisements that the Products did not present serious health risks.

71.     These and other representations made by Defendants were false when made and/or were made with the pretense of actual knowledge, when such knowledge did not actually exist, and were made recklessly and without regard to the true facts.

72.     These and other representations made by Defendants were made with the intention of deceiving Plaintiff, Plaintiff's healthcare professionals, and other members of the healthcare community and were made in order to induce Plaintiff and her healthcare professionals to rely on misrepresentations and caused Plaintiff to purchase, rely, use, and request the Products and her healthcare professionals to dispense, recommend, or prescribe the Products.

73.     Defendants' Products have been and continue to be marketed to the medical community and to patients as safe, effective, reliable, medical devices implanted by safe and effective minimally invasive surgical techniques for the treatment of medical conditions, primarily POP or SUI, and as safer and more effective as compared to the traditional product and procedures for treatment and other competing pelvic mesh products.

74.     The Defendants have marketed and sold the Products to the medical community at large and patients through carefully planned, multifaceted marketing campaigns and strategies. These campaigns and strategies include, but are not limited to, aggressive marketing to health care

providers at medical conferences, hospitals, and private offices and include the provision of valuable cash and non-cash benefits to health care providers. Also utilized are documents, brochures, and websites offering exaggerated and misleading expectations as to the safety and utility of the Products.

75.     Contrary to the Defendants' representations and marketing to the medical community and to the patients themselves, the Defendants' Products have high failure, injury, and complication rates, fail to perform as intended, require frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making them defective under the law. The Defendants consistently have underreported and withheld information about the propensity of the Products to fail and cause injury and complications, have misrepresented the efficacy and safety of the Products, and, through various means and media, have actively and intentionally been misleading the FDA, the medical community, patients, and the public at large.

76.     Defendants knew and had reason to know that the Products could and would cause severe and grievous personal injury to users and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

77.     Defendants knew or had reason to know that Plaintiff and her physicians and other healthcare providers had no way to determine the truth behind Defendants' concealment and omissions and that these included material omissions of facts surrounding the use of the Products, as described in detail above.

78.     In reliance upon these false representations, Plaintiff was induced to and did use the Products, thereby sustaining severe and permanent personal injuries and damages.

79.     Had Plaintiff or her treating physician known of the unreasonably dangerous risks associated with the Products at the time of her implant surgery, Plaintiff's physicians would have taken this information into consideration with respect to their recommendation and/or use of the Products, and Plaintiff would not have consented to the implantation of the Products had she known the true risks of the Product and chronic nature of injuries.

80.     As a direct and proximate result of Defendants' breaches of duty, as described above, Plaintiff has suffered and continues to suffer from serious and permanent physical and mental injuries. Additionally, Plaintiff has incurred significant expenses for medical care and treatment and will continue to incur such expenses in the future.

81.     As a direct, proximate, and foreseeable result of Defendants' negligence, Plaintiff has been damaged in an amount to be determined at trial.

## COUNT II:  STRICT LIABILITY – DESIGN DEFECT

82.     All paragraphs of this Complaint are hereby incorporated by reference as fully set forth herein.

83.     The Products implanted in Plaintiff were not reasonably safe for their intended use and were defective as described herein with respect to their design. The Products' design defects include, but are not limited to:

a)  The use of polypropylene mesh material in the Products and the immune reaction that results from such material, causing adverse reactions and injuries;

b)  The mesh material used in the Products is not pure as it contains additional compounds which are leached from the mesh and are toxic to tissue which enhances the body's inflammatory reaction (foreign body response);

c)  The design of the Products to be inserted into and through an area of the body with high levels of bacteria that adhere to the mesh causing immune reactions and subsequent tissue breakdown and adverse reactions and injuries;

d) The mesh material used in the Products harbors infections as a result of the weave of the mesh that adversely affect human tissues and patient heath;

e) Biomechanical issues with the design of the Products, including, but not limited to, the propensity of the mesh used in the Products to contract or shrink inside the body, that in turn causes surrounding tissue to be inflamed, become fibrotic, and contract, resulting in injury;

f) The use and design of arms and anchors in the Products, which, when placed in women, are likely to pass through contaminated spaces and injure major nerve routes in the pelvic region;

g) The propensity of the Products to "creep" or to gradually elongate and deform when subject to prolonged tension inside the body;

h) The inelasticity of the Products, causing them to be improperly mated to the delicate and sensitive areas of the pelvis where they are implanted, and causing pain upon normal daily activities that involve movement in the pelvis (e.g., intercourse, defecation);

i) The propensity of the Products for degradation or fragmentation over time, which causes a chronic inflammatory, foreign body reaction, and fibrotic reaction and results in continuing injury over time;

j) The creation of a non-anatomic condition in the pelvis leading to chronic pain and functional disabilities when the Products are implanted according to the manufacturer's instructions;

k) The failure to provide adequate Directions for Use and training regarding the Products;

l) Defendants used non-medical grade material and counterfeit material illegally smuggled in from China to make their medical devices, including Plaintiff's Products;

m) The pore size and stiffness of the mesh used in the Products were unsafe and resulted in unnecessary complications to women and created an unacceptable risk of chronic pain and the mesh ripping through vaginal tissue.

84. In the late 1990s, Defendants determined a safer mesh was available for use and subsequently changed the mesh used in their hernia applications. Defendants did not make a similar revision to the mesh used in the Products implanted in Plaintiff.

85. As a result of the design defect set forth herein, Defendants' Products were "defective", unfit, unsafe, inherently dangerous and "unreasonably dangerous" for their intended

and reasonably foreseeable uses. The Products do not meet or perform to the expectations of patients and their health care providers. Defendants' Products were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

86.     As a result of the design defects set forth herein, the risk of harm in the Products' design outweigh the utility of the design.

87.     Feasible, suitable, and safer alternative designs, as well as feasible, suitable, and safer alternative procedures and instruments for implantation, have existed at all times relevant as compared to the Products.  These feasible, suitable, and safer designs and procedures would have prevented or minimized Plaintiff's injuries.

88.     The Products are no more effective than treatments using biologic sling materials and Burch colposuspension.  Further, allograft sling treatment, for example, provides a more favorable outcome with a lower rate of complications than Defendants' Products.

89.     Using biologic sling materials, sutures (including polypropylene sutures), or polyvinylidene fluoride (PVDF) mesh does not present with the same chronic complications associated with the mesh material of Defendants' Products. All of these alternative materials, were available when Defendants' Products were first commercialized.

90.     Defendants' Products create risk to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions.

91.     The Products used by Plaintiff's physician were not substantially changed, modified, or altered at any time or in any manner whatsoever prior to use.  The Products implanted into Plaintiff were as in the same or substantially similar condition as they were when they left the possession of the Defendants and were received by Plaintiff.  The Products when implanted into

Plaintiff were as in the same or substantially similar condition directed by and expected by the Defendants.

92.     At no time did Plaintiff, or her physicians, have reason to believe that the Products were in a condition not suitable for its proper and intended use.

93.     Plaintiff was not able to discover, nor could she have discovered through the exercise of reasonable diligence, the design defect of the Products.

94.     Plaintiff and her physicians foreseeably used and implanted the Products and did not misuse or alter the Products in an unforeseeable manner.

95.     The medical and scientific literature studying the effects of polypropylene pelvic mesh, like found in Defendants' Products, have examined each of these injuries, conditions, and complications, such as those suffered by the Plaintiff, and determined that they are, in fact, causally related to the mesh itself and do not often implicate errors related to the implantation of the devices.

96.     Defendants violated the common law in addition to the Kentucky Products Liability Act, Ky. Rev. Stat. Ann. 411.300 *et seq* and the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*.

97.     Defendants intentionally and recklessly designed the Products with wanton and willful disregard for the rights and health of the Plaintiffs and others, and with malice, placing their economic interest above the health and safety of the Plaintiff and others.

98.     As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has suffered serious and permanent mental and physical injuries and pain and suffering.  Plaintiff has undergone medical treatment and will likely undergo future medical treatment and procedures, and has suffered financial or economic loss, including, but not

limited to, obligations for medical services and expenses, lost income, out of pocket expenses and other damages.

99.     Defendants are strictly liable to Plaintiff for designing, marketing, labeling, packaging, and selling the defective Products.

### COUNT III:  STRICT LIABILITY – MANUFACTURING DEFECT

100.     All paragraphs of this Complaint are hereby incorporated by reference as fully set forth herein.

101.     The Products implanted in Plaintiff were not reasonably safe for their intended and foreseeable uses and were defective as described herein as a matter of law with respect to their manufacture, in that they deviated materially from Defendants' design and manufacturing specifications in such a manner as to pose unreasonable risks of serious bodily harm to Plaintiff.

102.     At all relevant times, Defendants were the manufacturers of the Products.

103.     Defendants designed, manufactured, prepared, assembled, marketed, labeled, distributed and sold the Products.

104.     The Defendants designed the Products as permanent implants for long term use within the human body.

105.     However, due to the manufacturing defects of the mesh system found within the Products, the Products were "defective", unfit, unsafe, inherently dangerous and unreasonably dangers for their intended long term use.   The defects caused by improper or incorrect manufacturing rendered the Products unreasonably dangerous, deficient, and defective to consumers and to Plaintiff.

106.     The manufacturing of the Products was defective due to, among other things, the use of non-medical grade material, smuggling in counterfeit material from China to manufacture

the Products, and inadequate specifications that were not adhered to in the manufacturing of Plaintiff's Products.

107.   The Products are not compatible with human tissue and promote an immune response in a large subset of the population.

108.   Defendants' Products create risk to the health and safety of the patients that are far more significant and devastating than the risks posed by other products and procedures available to treat the corresponding medical conditions, and which far outweigh the utility of the Products.

109.   The Defendants' Products have high failure, injury, and complication rates, fails to perform as intended, requires frequent and often debilitating re-operations, and have caused severe and irreversible injuries, conditions, and damage to a significant number of women, including Plaintiff, making it defective under the law.

110.   The Products defects, as described herein, made the Products more dangerous than they would have been had the Products been manufactured properly and as specified.

111.   The Products defects, as described herein, existed at the time of manufacture; therefore, the defects were present in the Products when they left Defendants' control.

112.   The Products used by Plaintiff's physician were not substantially changed, modified, or altered at any time or in any manner whatsoever prior to use.  The Products implanted into Plaintiff were in the same or substantially similar condition as they were when they left the possession of the Defendants and in the condition directed by and expected by the Defendants.

113.   The Products were at all times utilized and implanted in a manner foreseeable to the Defendants, as Defendants generated the Directions for Use, created the procedures for implanting the Products, and trained the implanting physicians.

114.    At no time did Plaintiff, or her physicians, have reason to believe that the Products were in a condition not suitable for its proper and intended use.

115.    Plaintiff was not able to discover, nor could she have discovered through the exercise of reasonable diligence, the manufacturing defect of the Products.

116.    Defendants violated the common law in addition to the Kentucky Products Liability Act, Ky. Rev. Stat. Ann. 411.300 *et seq* and the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*.

117.    Defendants intentionally and recklessly manufactured the Products with wanton and willful disregard for the rights and health of the Plaintiffs and others, and with malice, placing their economic interest above the health and safety of the Plaintiff and others.

118.    As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has suffered serious and permanent mental and physical injuries and pain and suffering; has undergone medical treatment and/or corrective surgery and hospitalization, and likely will undergo further medical treatment and procedures; and  has  suffered  financial and/or  economic  loss,  including,  but  not  limited  to, obligations for medical services and expenses, and/or lost income, out of pocket expenses and other damages.

119.    Defendants are strictly liable to Plaintiff for manufacturing and selling the defective Product.

## COUNT IV: STRICT LIABILITY – FAILURE TO WARN

120.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

121.    Defendants had a duty to give an adequate warning of known or reasonably foreseeable dangers, risks, and complications arising from the use of the Products.  Defendants

owed this duty to warn all persons whom Defendants should have reasonable foreseen my use or be affected by the Products, including, but not limited to, Plaintiff, Plaintiff's healthcare providers, and the FDA.

122.    Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public, Plaintiff, Plaintiff's healthcare providers, and the FDA.

123.    The Products implanted in Plaintiff were not reasonably safe for their intended use and were defective as described herein as a matter of law due to their lack of adequate, appropriate and necessary warnings. Specifically, Defendants did not provide sufficient or adequate warnings regarding, among other subjects:

a)  The Products' propensities to contract, retract, and/or shrink inside the body;

b)  The Products' propensities for degradation, fragmentation, disintegration and/or creep as seen in scientific literature and reports from Defendants' physician consultants;

c)  The Products' inelasticity preventing proper mating with the pelvic floor and vaginal region;

d)  The rate and manner of mesh erosion or extrusion for the Products;

e)  The risk of chronic inflammation resulting from the Products;

f)  The risk of chronic infections resulting from the Products;

g)  The risk of chronic pain resulting from the Products;

h)  The risk of permanent vaginal or pelvic scarring as a result of the Products;

i)  The risk of recurrent, intractable pelvic pain and other pain resulting from the Products;

j)  The need for corrective or revision surgery to adjust or remove the Products;

k)  The risk and severity of foreign body response of the Products as compared to feasible available alternatives;

l)   The severity of complications that could arise as a result of implantation of the Products;

m)  Treatment of SUI with the Products are no more effective than feasible available alternatives;

n)   Treatment of SUI with the Products exposes patients to greater risk than feasible available alternatives;

o)   Treatment of SUI with the Product makes future surgical repair more difficult than feasible available alternatives;

p)   Use of the Products puts the patient at greater risk of requiring additional surgery than feasible available alternatives;

q)   Removal of the Products due to complications may involve multiple surgeries and may significantly impair the patient's quality of life;

r)   Complete removal of the Product may not be possible and may not result in complete resolution of the complications, including pain;

s)   The nature, magnitude, and frequency of complications that could arise as a result of implantation of the Products; and

t)   the material of the Products was never intended to be used in a medical device permanently implanted in the body and the material was non-medical grade.

124.    Defendants acted unreasonably in failing to undertake their duties to properly know the qualities of the Product and, in representations to Plaintiff and/or to Plaintiff's health care providers, concealed and intentionally omitted the following material information:

a)   That the Products were not as safe as other products and procedures available to treat incontinence and/or prolapse;

b)   That the risk of adverse events with the Products were higher than with other products and procedures available to treat incontinence and/or prolapse;

c)   That the risk of adverse events with the Products were known by Defendants and were not adequately tested;

d)   That the limited clinical testing revealed the Products had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

e) That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f) That Defendants were aware of dangers in their Products, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat incontinence and/or prolapse;

g) That the Products were dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence and/or prolapse;

h) That patients frequently would need revisionary surgery due to changes in the structure of the Products that would cause it to be become loose or shift position within the body;

i) That patients needed to be monitored more regularly than usual while using the Products and, in the event the Products needed to be removed, that the procedure to remove the Products had a very high failure rate and/or needed to be performed repeatedly;

j) That material the Defendants were using to produce the Products carried a specific safety warning to never be used as a permanent implant in the human body;

k) That Defendants rushed the Products to market against the concerns of consultants and employees;

l) That Defendants were aware of safety issues with design of the Products and the pain it caused to patients;

m) That Defendants were aware the Product was not as safe or efficacious as other alternatives;

n) The Defendants' internal risk assessments concluded there was a lack of data to support the safety and efficacy of the Products; and

o) That Defendants received complaints about the design of the Products, including from their own consultants, only to conceal them and not make any changes to the Products' design.

125.    Defendants were aware of numerous risks with the Products as a result of several published, peer reviewed, scientific studies, including, but not limited to, the defects and unreasonable risks identified above.

126.    Defendants were under a duty to disclose to Plaintiff and her physicians the defective nature of the Products, including, but not limited to, the heightened risks of erosion, failure, chronic pain, and permanent injury.

127.    Defendants misrepresented to the medical and healthcare community, Plaintiff, the FDA, and the public at large that the Products had been tested and was found to be safe and effective for the purposes of treating SUI.

128.    These representations were made by Defendants with the intent of inducing Plaintiff, the medical community, and the public to recommend, prescribe, dispense, and purchase the Products for use as a means of treatment for SUI, all of which evinced an indifference to the health, safety, and welfare of Plaintiff.

129.    Defendants had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious, dangerous, and chronic side effects and, hence, cause dangerous injuries and damage to women who used the Products, including Plaintiff.

130.    At the time these representations were made by Defendants and at the time Plaintiff used the Products, she was unaware of the falsehood of these representations, and reasonably believed them to be true.

131.    Defendants' concealment and omissions of material facts concerning the safety of the Products were made to cause Plaintiff's physicians and healthcare providers to purchase, prescribe, and/or dispense the Product; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Products.

132.    The Defendants provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians utilizing the Products and,

thus, increase the sales of the Products, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

133.    Defendants intentionally made material misrepresentations to the medical community and public, including Plaintiff, regarding the safety of the Products, specifically that they did not have dangerous and/or serious adverse health safety concerns and that they were as safe as other means of treating SUI.

134.    Defendants intentionally failed to inform the public, including Plaintiff, of the high failure rate, erosion, the difficulty of removing the Products, and the risk of permanent injury.

135.    Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Products.

136.    Defendants violated the common law in addition to the Kentucky Products Liability Act, Ky. Rev. Stat. Ann. 411.300 *et seq* and the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*.

137.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Products, she would not have purchased, used, or relied on the Products.

138.    As a direct and proximate result of the Products' aforementioned defects as described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

139.    Defendants are strictly liable to Plaintiff for their failure to provide adequate and sufficient warnings to Plaintiff and to foreseeable users of the defective Products.

## COUNT V: BREACH OF EXPRESS WARRANTY

140.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

141.    At all relevant times, Defendants developed, designed, manufactured, labeled, packaged, distributed, marketed, supplied, advertised, sold and otherwise engaged in all activities that are part and parcel of the sale and distribution of the Products with the intent that it would be implanted in patients, like Plaintiff.  Defendants represented the quality and effectiveness to health care professionals, the FDA, Plaintiff and the public in such a way as to induce purchase or use of the Products, thereby making an express warranty that the Products would conform to representations.

142.    Defendants made assurances as described herein to the general public, hospitals, and health care professionals that the Products were safe, effective and reasonably fit for use by individuals, like Plaintiff, for their intended purposes.

143.    At all relevant times, Ethicon intended that its Products be used in the manner that Plaintiff used the Products and Ethicon expressly warranted that each Product was safe and fit for use by consumers, that it was of merchantable quality, that its side effects were minimal, and that it was adequately tested and fit for its intended use.

144.    The Products were expected to reach and did, in fact, reach consumers, including Plaintiff's physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

145.    At all relevant times, Plaintiff and/or her implanting physicians used the Products for the purpose and manner intended by Defendants.

146.    As a result of Defendants' research and testing, or lack thereof, they distributed false information including, but not limited to, assuring Plaintiff, the public, and Plaintiff's

healthcare providers and physicians that the Products were safe for use as a means of providing relief from SUI and were as safe or safer than other products and/or procedures available and on the market. As a result of Defendants' research and testing, or lack thereof, Defendants intentionally omitted, concealed and suppressed certain results of testing and research of the Products to healthcare professionals, Plaintiff, and the public at large.

147.    The information that Defendants distributed to the public, the medical community, the FDA, and Plaintiff included, but was not limited to, reports, press releases, advertising campaigns, television commercials, print advertisements, billboards and other commercial media containing material representations, which were false and misleading and contained omissions and concealment of the truth about the dangers of the use of the Products.

148.    Defendants' intent and purpose in making these misrepresentations were to deceive the public, the medical community, and Plaintiff; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure the public, the medical community, and Plaintiff of the quality and fitness for use of the Products; and to induce Plaintiff, the public and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Products.

149.    Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Products.

150.    Plaintiff and/or her implanting physicians were at all times in privity with Defendants.

151.    At the time the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and/or safety risks inherent in the use of the Products.

152.    At the time the representations were made, Plaintiff did not discover the true facts about the dangers and serious health and/or safety risks of the Products, nor did Plaintiff discover the false representations of Defendants about the Products, nor would Plaintiff with reasonable diligence have discovered the true facts or Defendants' misrepresentations about the Products.

153.    Defendants recklessly and/or intentionally falsely represented the dangerous and serious health and safety concerns inherent in the use of the Products to the public at large for the purpose of influencing the sales of product known to be dangerous and defective and/or not as safe as other alternatives.

154.    Plaintiff and/or her healthcare provider chose the Products based upon Defendants' warranties and representations as described herein regarding the safety and fitness of the Products.

155.    Plaintiff, individually, and/or by and through her physician, reasonably relied upon Defendants' express warranties and guarantees that the Products were safe, merchantable, and reasonably fit for their intended purposes – and stated the Products was permanent, safe, approved by the FDA, had low complications, high success rates and utilized material that performed better than alternative options available to the Plaintiff.

156.    Defendants breached these express warranties because the Products implanted in Plaintiff were unreasonably dangerous and defective as described herein and not as Defendants had represented.

157.    Defendants' breach of the express warranties resulted in the implantation of unreasonably dangerous and defective Products in the body of Plaintiff, placing Plaintiff's health and safety in jeopardy.

158.    As a direct and proximate result of Defendants' breach of the aforementioned express warranties, Plaintiff has experienced significant mental and physical pain and suffering,

has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VI:  BREACH OF IMPLIED WARRANTY

159.    Plaintiff incorporates by reference all prior paragraphs of this Complaint as if fully set forth herein.

160.    At all relevant times, Defendants manufactured, distributed, advertised, promoted, and sold the Products.

161.    At all relevant times, Defendants intended that the Defendants' Products be implanted for the purposes and in the manner that Plaintiff's implanting physician in fact used.

162.    The Products were expected to reach and did, in fact, reach consumers, including Plaintiff's physicians, without substantial change in the condition in which it was manufactured and sold by Defendants.

163.    Defendants were aware that consumers, including Plaintiff's physicians, would implant the Products in the manner directed by the instructions for use, which is to say that Plaintiff was a foreseeable user of the Products.

164.    When the Products were implanted in Plaintiff to treat her SUI, they were being used for the ordinary purposes for which it was intended.

165.    Defendants impliedly warranted that the Products were merchantable and were safe and fit for the ordinary purposes for which it was intended, even though they were not adequately tested.

166.    Plaintiff and/or her physicians were at all relevant times in privity with the Defendants.

167.    Plaintiff, individually, and/or by and through her physicians, relied upon Defendants' implied warranties of merchantability in consenting to have the Products implanted in her.

168.    In reliance upon Defendants' implied warranty, Plaintiff used the Product as prescribed and in the foreseeable manner normally intended, recommended, promoted, and marketed by Defendants.

169.    Defendants breached their implied warranty to Plaintiff in that the Products were not of merchantable quality, safe and fit for intended use, or adequately tested, in violation of Common Law principles and the statutory provisions of the State of Kentucky.

170.    Defendants breached various implied warranties with respect to the Products, including, but not limited to, the following:

a) Defendants represented through their labeling, advertising, marketing materials, detail persons, seminar presentations, publications, notice letters, and regulatory submissions that the Defendants' Products were safe and fraudulently withheld and concealed information about the substantial risks of serious injury and/or death associated with using the  Products;

b) Defendants represented that the Defendants' Products were safe, and/or safer than other alternative devices or procedures and that complications were rare, and fraudulently concealed information, which demonstrated that the Products were not as safe or safer than alternatives available on the market: and

c) Defendants represented that the Defendants' Products were more efficacious than alternative pelvic mesh products and procedures and fraudulently concealed information regarding the true efficacy of the Products.

171.    Defendants' breach of their implied warranties resulted in the implantation of an unreasonably dangerous and defective Products in the body of Plaintiff, placing Plaintiff's health and safety in jeopardy.

172.    Defendants violated the common law in addition to Ky. Rev. Stat. 355.2-318 *et seq.*

173.    As a direct and proximate result of Defendants' breach of the aforementioned implied warranties, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VII: COMMON LAW FRAUD

174.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth here.

175.    Defendants falsely and fraudulently represented and continue to represent to the medical and healthcare community, Plaintiff, and the public that the Products had been tested and found to be safe and effective. The representations made by Defendants were, in fact, false.

176.    Defendants knew or had reason to know that their representations were false, and Defendants willfully, wantonly, and recklessly disregarded the inaccuracies in their representations and the dangers and health risks to users of the Products implanted in Plaintiff.

177.    In representations to Plaintiff and/or her healthcare providers, Defendant fraudulently concealed and intentionally or recklessly omitted the following material information:

a)     That the Products were not as safe as other products and procedures available to treat incontinence;

b)     That the risk of adverse events with the Products were higher than with other products and procedures available to treat incontinence;

c)     That the risk of adverse events with the Products were known by Defendants and were not adequately tested;

d)     That the limited clinical testing revealed the Products had a higher risk of adverse effects in addition to and above and beyond those associated with other products and procedures available to treat incontinence;

e)      That Defendants failed to follow up on the adverse results from clinical studies and buried and/or misrepresented those findings;

f)      That Defendants were aware of dangers in their Products, including the pelvic mesh systems, in addition to and above and beyond those associated with other products and procedures available to treat SUI;

g)      That the Products were dangerous and caused adverse side effects, including, but not limited to, higher incidence of erosion and failure at a much more significant rate than other products and procedures available to treat incontinence;

h)      That patients frequently would need revisionary surgery due to changes in the structure of the  Products that would cause them to be become loose or shift position within the body;

i)      That patients needed to be monitored more regularly than usual while using the Products and, in the event the Products needed to be removed, that the procedure to remove the Products had a very  high failure rate and/or needed to be performed repeatedly;

j)      That material the Defendants were using in the Products carried a specific safety warning to never be used as a permanent  implant in the human body;

k)      That Defendants rushed the Products to market against the concerns of consultants and employees;

l)      That Defendants were aware of safety issues with design of the Products and the pain it caused to patients and lack of effectiveness; and

m)      That Defendants were aware the Products were not as safe or efficacious as other alternatives.

178.    Defendants were under a duty to disclose to Plaintiff, her physicians, the public, and the FDA the defective nature of the Products, including, but not limited to, the heightened risks of erosion, failure, chronic pain, foreign body response, and permanent injury.

179.    Defendants misrepresented to the medical and healthcare community,  Plaintiff, the FDA, and the public at large that the Products had been tested and were found to be safe and effective for the purposes of treating SUI.

180.    Defendants' concealment and omissions of material fact concerning the safety of the Products were made purposefully, willfully, wantonly, and/or recklessly to mislead, and to cause Plaintiff's physicians and healthcare providers to recommend, prescribe, dispense, and purchase the Products; and/or to mislead Plaintiff into reliance and cause Plaintiff to use the Products.

181.    Defendants had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Products.

182.    At the time these representations were made by Defendants and at the time Plaintiff used the Products, she was unaware of the falsehood of these representations and reasonably believed them to be true.

183.    Defendants knew or had reason to know that the Products could and would cause severe and grievous injury to the users of the Products and that they were inherently dangerous in a manner that exceeded any purported, inaccurate, or otherwise downplayed warnings.

184.    The Defendants provided incomplete, insufficient, and misleading training and information to physicians in order to increase the number of physicians utilizing the Products and, thus, increase the sales of the Products, leading to the dissemination of inadequate and misleading information to patients, including Plaintiff.

185.    Defendants intentionally made material misrepresentations to the medical community, the FDA, and the public, including Plaintiff, regarding the safety of the Products, specifically that it did not have dangerous and/or serious adverse health safety concerns and that it was as safe as other means of treating SUI.

186.    Defendants intentionally failed to inform the medical community, the FDA, and the public, including Plaintiff, of the high failure rate, erosion, the difficulty of removing the Products, and the risk of permanent injury.

187.    Instead, Defendants chose to over-promote the safety, efficacy, and benefits of the Products.

188.    Defendants' intent and purpose in making these representations was to deceive and defraud the public, the medical community, and Plaintiffs; to gain the confidence of the public, the medical community, and Plaintiff; to falsely assure them of the quality and fitness for use of the Products; and induce Plaintiff, the public, and the medical community to request, recommend, prescribe, dispense, purchase, and continue to use the Products.

189.    At the time that the representations were made, Plaintiff and her healthcare providers did not know the truth about the dangers and serious health and safety risks inherent in the use of the Products.

190.    At the time that the representations were made, Plaintiff could not have discovered the true facts about the dangers and serious health and safety risks, nor could have the Plaintiff discovered the false representations of Defendants nor would Plaintiff, with reasonable diligence, have discovered the true facts or Defendants' misrepresentations.

191.    Plaintiff reasonably relied on revealed facts that foreseeably and purposefully suppressed and concealed facts that were critical to understanding the real dangers inherent in the use of the Products.

192.    Had Plaintiff known the true facts about the dangers and serious health and/or safety risks of the Product, she would not have purchased, used, or relied on the Products.

193.     Having knowledge based upon Defendants' research and testing, or lack thereof, Defendants blatantly and intentionally distributed false information, including, but not limited to, assuring Plaintiff, the public, and Plaintiff's healthcare providers and physicians, that the Defendants' Products were safe for use as a means of providing relief from SUI and were as safe or safer than other products or procedures available and on the market. As a result, Defendants intentionally omitted, concealed and suppressed certain results of testing and research to healthcare professionals, Plaintiff, and the public at large.

194.     Defendants utilized direct-to-consumer advertising to market, promote, and advertise the Defendants' Products.

195.     Defendants' wrongful conduct constitutes fraud and deceit and was committed and perpetrated willfully, wantonly, and/or purposefully on Plaintiff.

196.     As a direct and proximate result of Defendants' fraudulent behavior described herein, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT VIII: CONSTRUCTIVE FRAUD

197.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth here.

198.     Defendants are in a unique position of knowledge concerning the quality, safety, and efficacy of the Products, which knowledge is not possessed by Plaintiff or her physicians, and Defendants, thereby, hold a position of superiority over Plaintiff and her physician.

199.     Despite their unique and superior knowledge regarding the defective nature of the Products, Defendants continue to suppress, conceal, omit, and/or misrepresent information to Plaintiff, the medical community, and the FDA concerning the severity of risks and dangers inherent in the intended use of the Product, as compared to other products and forms of treatment.

200.     For example, scientists in a study published in *Obstetrics & Gynecology*, August 2010, found that the complication rate was so high that the clinical trial was halted early.

201.     Defendants have concealed and suppressed material information, including limited clinical testing, that would reveal that the Products had a higher risk of adverse effects in addition to and exceeding those associated with alternative procedures and available devices.  Instead, Defendants have misrepresented the safety and efficacy of the Products.

202.     Upon information and belief, Defendants' misrepresentations are designed to induce physicians and Plaintiff to prescribe, dispense, recommend, and/or purchase the Products, as the case may be.   Plaintiff and the medical community have relied on Defendants' representations.

203.     Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and her medical providers and engaged in constructive fraud in their relationship with Plaintiff and her medical providers.   Plaintiff reasonably relied on Defendants' representations.

204.     As a proximate result of the Defendants' conduct, Plaintiff has been injured and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care and comfort, and economic damages.

## COUNT IX: FRAUDULENT CONCEALMENT

205.   All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth here.

206.   Plaintiff asserts all applicable state statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, class action tolling, delayed discovery, discovery rule, and fraudulent concealment.

207.   Plaintiff pleads that the discovery rule should be applied to toll the running of the statute of limitations until Plaintiff knew, or through the exercise of reasonable care and diligence should have known, of facts indicating that Plaintiff 's injuries may have been  caused by Defendants' conduct and/or defective Products.

208.   Despite diligent and reasonable investigation by Plaintiff into the cause of her injuries, including consultations with her medical providers, the nature of Plaintiff's injuries and damages and their relationship to the Products were not discovered, and through reasonable care and due diligence could not have been discovered, until a date within the applicable statute of limitations for filing Plaintiff's claims. Therefore, under appropriate application of the discovery rule, Plaintiff's action was filed well within the applicable statutory limitations period.

209.   The running of the statute of limitations in this action is tolled due to equitable tolling. Defendants are estopped from asserting a statute of limitations defense due to Defendants' fraudulent concealment through affirmative misrepresentations and omissions from Plaintiff and Plaintiff's physicians of the true risks associated with the Products. As a result of Defendants' fraudulent concealment, Plaintiff and Plaintiff's physicians were unaware, and could not have known or have learned through reasonable diligence, that Plaintiff had been exposed to the risks

alleged herein and that those risks were the direct and proximate result of the wrongful acts and omissions of the Defendants.

## <u>COUNT X:  GROSS NEGLIGENCE</u>

210.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

211.    In committing the acts and / or omissions set forth herein that directly and proximately caused Plaintiff's injuries, as set forth herein, Defendants breached their duty to Plaintiff and demonstrated a conscious, reckless, willful, and wanton indifference to and disregard of the consequences of their actions and / or omissions.

212.    Defendants have known and continue to know that some of the predicate product for their pelvic mesh products had high failure and complication rates, resulting in the recall of some of these predicate devices; that there were and are differences between the Defendants' Product and some or all of the predicate products, rendering them unsuitable for designation as predicate products; that significant differences exist and existed between the Product and its predecessor and predicate products, such that the disclosures to the FDA were and are incomplete and misleading; and that the Product was and is causing numerous patients severe injuries and complications. The Defendants suppressed this information and failed to accurately and completely disseminate or share this and other critical information with the FDA, health care providers, or the patients. As a result, the Defendants actively and intentionally misled and continue to mislead the public, including the medical community, health care providers, and patients, into believing that the Products and the procedures for its implantation were and are safe and effective. This led to the prescription for and implantation of the Products into Plaintiff.

213.     The injuries, conditions, and complications suffered by women who have been implanted with Defendants' Products include, without limitation: mesh erosion, mesh contraction, infection, fistula, inflammation, scar tissue, organ perforation, dyspareunia, blood loss, foreign body response, neuropathic and other acute and chronic nerve damage and pain, pudendal nerve damage, pelvic floor damage, chronic pelvic pain, urinary and fecal incontinence, the recurrent prolapse of organs and/or stress urinary incontinence, and, in many cases, the women have been forced to undergo intensive medical treatment including, but not limited to, operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue, and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the vagina, and operations to remove portions of the female genitalia.

214.     Again, Defendants had sole access to material facts concerning the defective nature of the Products and their propensity to cause serious and dangerous side effects and, hence, cause dangerous injuries and damage to women who used the Products.

215.     Defendants were grossly negligent by showing a complete indifference for the safety and health of Plaintiff and others similarly situated in negligently designing, packaging, labeling, marketing, advertising, promoting, distributing, and selling the defective and unreasonably dangerous Products and in negligently failing to warn Plaintiff of the significant risks and complications associated with the Products, as set forth above.

216.     In light of the knowledge Defendants had concerning the risks and complications associated with its Products, as set forth above, Defendants continued to show an utter disregard and complete indifference for the safety of Plaintiff by failing to provide adequate warnings concerning the risks and complications associated with its Products, making material

misrepresentations and placing profits from sales of its device over the safety of patients receiving its Product.

217.    The wrongs done by Defendants were aggravated by the kind of malice, fraud, and grossly negligent disregard for the rights of others, the public, and Plaintiff for which the law will not allow, and for which Plaintiff seeks exemplary damages, in that Defendants' conduct, including the failure to comply with applicable industry standards, was specifically intended to cause substantial injury to Plaintiff; or when viewed objectively from Defendants' standpoint at the time of the conduct, involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others, including Plaintiff, and Defendants actually were subjectively aware of the risk involved, but nevertheless proceeded with conscious indifference to the rights, safety, or welfare of others, including Plaintiff; or included a material representation that was false, with Defendants knowing that it was false or with reckless disregard as to its truth and as a positive assertion, with the intent that the representation is acted on by Plaintiff.

218.    As a direct and proximate result of Defendants' gross negligence, Plaintiff has experienced significant mental and physical pain and suffering, has sustained permanent injury, has undergone medical treatment and will likely undergo further medical treatment and procedures, and has suffered financial or economic loss, including, but not limited to, obligations for medical services and expenses, and/or lost income, and other damages.

## COUNT XI: NEGLIGENT MISREPRESENTATION

219.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

220.    Defendants had a duty to accurately and truthfully represent to the medical and healthcare community, Plaintiff and the public that the Pelvic Mesh Products had not been

adequately tested and found to be safe and effective for the treatment of urinary incontinence and pelvic organ prolapse. The representations made by Ethicon, in fact, were false.

221.   Defendants failed to exercise ordinary care in the representations concerning the Products while Defendants were involved in their development, design, manufacture, label, package, distribution, marketing, testing, supply, advertisement, selling, quality assurance, quality control and otherwise engaged in all activities that are part and parcel of the sale and distribution in interstate commerce, because Defendants negligently misrepresented the Products' high risk of unreasonable, dangerous, adverse side effects.

222.   Defendants breached their duty in representing that their Products had no serious side effects different from older generations of similar products and/or procedures to Plaintiff, Plaintiff's physicians and the medical and healthcare community.

223.   As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all, and that they lacked adequate and accurate warnings, and that it created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including mesh erosion, extrusion/protrusion, chronic pain, mesh contraction, infection, abscesses, fistula, inflammation, scar tissue, organ perforation, dyspareunia, bleeding, neuropathic, and other acute and chronic nerve damage and pain, pudendal nerve damage, vaginal scarring, vaginal shrinkage, pelvic floor damage, pelvic pain, urinary and fecal problems, prolapse of organs, and in many cases forcing the need for intensive medical treatment, including but not limited to operations to locate and remove mesh, operations to attempt to repair pelvic organs, tissue and nerve damage, the use of pain control and other medications, injections into various areas of the pelvis, spine, and the

vagina, and operations to remove portions of the female genitalia, injuries to the woman's intimate partner and other severe and personal injuries, which are permanent and lasting in nature.

224.     Defendants took unconscionable advantage of their dominant position of knowledge with regard to Plaintiff and the medical providers and engaged in negligent misrepresentations in their relationship with Plaintiff and the medical providers. Plaintiff reasonably and justifiably relied on Defendants' misrepresentations.

225.     As a direct and proximate result of Defendants' wrongful conduct, including Defendants' negligent misrepresentation, Plaintiff has sustained and will continue to sustain severe and debilitating injuries, serious bodily injury, mental and physical pain and suffering and has incurred economic loss.

## <u>COUNT XII: CONSUMER FRAUD</u>

226.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

227.     Defendants violated the common law in addition to the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*.

228.     Under the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*., Defendants are the suppliers, manufacturers, advertisers, and sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent and unconscionable consumer sales practices.

229.     Plaintiff purchased and used the Defendants' Products primarily for personal use and thereby suffered ascertainable losses as a result of Defendants' actions in violation of Ky. Rev. Stat. Ann. 367.170 *et seq*.

230. Defendants have a statutory duty to refrain from unfair or deceptive acts or trade practices in the design, labeling, development, manufacture, promotion, and sale of the Defendants' Products.

231. Had Defendants not engaged in the deceptive conduct described herein, Plaintiff would not have purchased and/or paid for the Defendants' Products, and would not have incurred related medical costs and injury.

232. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, moneys from Plaintiff for the Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

233. Unfair methods of competition or deceptive acts or practices that were proscribed by law, including the following:

   a. Representing that goods or services have characteristics, ingredients, uses benefits or quantities that they do not have;
   b. Advertising goods or services with the intent not to sell them as advertised; and,
   c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding.

234. Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of Defendants' conduct directed at patients, physicians and consumers was to create demand for and sell the Defendants' Products. Each aspect of Defendants' conduct combined to artificially create sales of the Defendants' Products.

235. Had Defendants not engaged in the deceptive conduct described above, Plaintiff would not have purchased and/or paid for the Products, and would not have incurred related medical costs.

236. Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to patients, physicians and consumers, including Plaintiff, constituted unfair and

deceptive acts and trade practices in violation of the state consumer protection statutes listed below.

237.    Defendants' actions, as complained of herein, constitute unfair competition or unfair, unconscionable, deceptive or fraudulent acts, or trade practices in violation of state consumer protection statutes, as listed below.

238.    Defendants have engaged in unfair competition or unfair or deceptive acts or trade practices or have made false representations in violation of the statutory provisions of the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*.

239.    Defendants violated Ky. Rev. Stat. Ann. 367.170 *et seq*., by knowingly and falsely representing that the Defendants' Products were fit to be used for the purpose for which they were intended, when in fact they were defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

240.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under Ky. Rev. Stat. Ann. 367.170 *et seq*.

241.    Defendants had actual knowledge of the defective and dangerous condition of the Defendants' Products and failed to take any action to cure such defective and dangerous conditions.

242.    Plaintiff and her physicians relied upon Defendants' misrepresentations and omissions in determining which product and/or procedure to undergo and/or perform (if any).

243.    Defendants' deceptive, unconscionable or fraudulent representations and material omissions to patients, physicians and consumers, constituted unfair and deceptive acts and practices.

244.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff has suffered ascertainable losses and damages.

245.    As a direct and proximate result of Defendants' violation of the Kentucky Consumer Protection Law, Ky. Rev. Stat. Ann. 367.170 *et seq*. Plaintiff has sustained economic losses, injuries and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

## COUNT XIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

246.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

247.    Defendants carelessly and negligently manufactured, designed, developed, tested, labeled, marketed and sold the Defendants' Products to Plaintiff and her physicians, carelessly and negligently concealing the harmful effects of the Defendants' Products from Plaintiff, and carelessly and negligently misrepresented the quality, safety and efficacy of the products.

248.    Plaintiff was directly impacted by Defendants' carelessness and negligence, in that Plaintiff has sustained and will continue to sustain severe physical injuries, economic losses, and other damages as a direct result of the decision to purchase the Products sold and distributed by Defendants and the implantation in her. The impact of the physical injuries and economic loss has further caused, and continues to cause, Plaintiff emotional distress.

249.    As a direct and proximate result of the Defendants' conduct, Plaintiff has been injured, and sustained severe and permanent pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and consortium, economic damages, and death.

## COUNT XIV: UNJUST ENRICHMENT

250.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

251.    Defendants are and at all times relevant were the manufacturers, sellers, and/or suppliers of the Products.

252.    Plaintiff paid for the Defendants' Products for the purpose of treatment of stress urinary incontinence.

253.    Defendants have accepted payment from Plaintiff and others on Plaintiff's behalf for the purchase of the Defendants' Products.

254.    Plaintiff has not received the safe and effective medical devices for which she paid. Defendants have voluntarily accepted and retained these profits and benefits, derived from Plaintiff, with full knowledge and awareness that, as a result of Defendants' fraud and other conscious and intentional wrongdoing, Plaintiff was not receiving a product of the quality, nature or fitness that had been represented by Defendants or that Plaintiff, as a reasonable consumer, expected.

255.    It would be inequitable for Defendants to keep this money since Plaintiff did not in fact receive a safe and effective medical device as represented by Defendants.

256.    By virtue of the conscious wrongdoing alleged above, Defendants have been unjustly enriched at the expense of Plaintiff, who is entitled to in equity, and hereby seeks, the disgorgement and restitution of Defendants' wrongful profits, revenues and benefits, to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy the Defendants' unjust enrichment.

257.     As a direct and proximate result of Defendants' conduct Plaintiff has sustained economic losses, injuries and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

## COUNT XV: PUNITIVE DAMAGES

258.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

259.     Defendants sold the Products to the healthcare providers of Plaintiff in the State of Kentucky and throughout the United States without doing adequate testing to ensure that the Products were reasonably safe for implantation in the female pelvic area.

260.     Defendants sold the Products to Plaintiff's health care providers and other health care providers in the State of Kentucky and throughout the United States in spite of their knowledge that the Products can shrink, disintegrate and/or degrade inside the body, and cause the other problems heretofore set forth in this Complaint, thereby causing severe and debilitating injuries suffered by Plaintiff and numerous other women.

261.     Defendants ignored reports from patients and health care providers throughout the United States and elsewhere of the Products' failures to perform as intended, which lead to the severe and debilitating injuries suffered by Plaintiff and numerous other women. Rather than doing adequate testing to determine the cause of these injuries or to rule out the Products' designs or the processes by which the Products are manufactured as the cause of these injuries, Defendant chose instead to continue to market and sell the Products as safe and effective.

262.     Defendants withheld material information from the medical community and the public in general, including Plaintiff, regarding the safety and efficacy of the Products.

263.    Defendants knew and recklessly disregarded the fact that the Products caused debilitating and potentially life-altering complications with greater frequency than feasible alternative methods and/or products used to treat SUI.

264.    Defendants misstated and misrepresented data and continue to misrepresent data so as to minimize the perceived risk of injuries caused by the Products.

265.    Notwithstanding the foregoing, Defendants continue to aggressively market the Product to consumers, without disclosing the true risks associated with the Products.

266.    Defendants knew of the Products' defective and unreasonably dangerous nature, but continued to mislead physicians and patients and to manufacture, market, distribute, and sell the Products so as to maximize sales and profits at the expense of the health and safety of the public, including the Plaintiff.

267.    Defendants continue to conceal and/or fail to disclose to the public, including the Plaintiff, the serious complications associated with the use of the Products to ensure continued and increased sales of the Products.

268.    Defendants' conduct as described herein shows willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care that raises the presumption of conscious indifference to consequences, thereby justifying an award of punitive damages.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, for the reasons stated above, Plaintiff respectfully requests that the Court enter judgment in her favor against Defendants for actual, compensatory, and punitive damages, plus attorneys' fees and expenses, costs, interest, and such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a jury trial on all claims so triable in this action.


Dated: December 30, 2020                    Respectfully submitted,

                                            HERREN LAW, PLLC
                                            148 N. Broadway
                                            Lexington, KY  40507
                                            (859) 254-0024
                                            *e-mail:*  *tom.herren@herrenadams.com*


                                            */s/ Thomas K. Herren*
                                            THOMAS K. HERREN (Bar ID #31500)
                                            *Counsel for Plaintiff*


c:\users\judy\documents\hoo656.com.docx